Marion **HICKINGBOTTOM**, Plaintiff,

v.

John W. **EASLEY**, Individually, and in his capacity as President of the Phillips County Community College; et al., Defendants.

No. H–76–C–19.

United States District Court,
E. D. Arkansas, E. D.

Aug. 8, 1980.

Charles B. Roscopf, Roscopf & Epes, P.A., Helena, Ark., for plaintiff.

Jimason J. Daggett, Daggett, Daggett & Van Dover, Marianna, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

This is an action filed by plaintiff, Marion Hickingbottom, against the President and Board of Trustees of Phillips County Community College, individually and in their representative capacities, alleging that his employment as an instructor was wrongfully terminated in violation of his right of freedom of speech guaranteed by the First and Fourteenth Amendments to the Constitution and by 42 U.S.C. § 1983. Jurisdiction of the Court is alleged on the basis of 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983.

Defendants deny that the plaintiff was unlawfully terminated as a professor. The defendants also state that if any act allegedly committed by them, which is expressly denied, was committed, such act was in their official capacities and that they are immune from liability for damages arising from conduct while in their official capacity.

Pursuant to regular setting, the matter was tried to the Court, without the intervention of a jury, with the consent of all parties and waiver of right to trial by jury. The Court heard and received evidence from plaintiff, present in person and represented by Hon. Charles B. Roscopf and Hon. Wooten Epes, Jr., and from defendants, represented by Hon. Jimason Daggett. The parties rested and the matter was taken under advisement pending receipt of briefs of counsel. All briefs have now been received and the matter submitted for determination.

The Court, in consideration of the pleadings, testimony, exhibits, and the entire record, and after careful review of the briefs and authorities presented by counsel, makes the following findings of fact and conclusions of law, which are incorporated herein

pursuant to Rule 52, Federal Rules of Civil Procedure:

Plaintiff was a resident citizen of the United States and the State of Arkansas at the time of filing of this suit. Defendants are alleged to have acted as to the allegations of the complaint in their individual and official capacities as President and Board of Trustees of Phillips County Community College, a state institution of higher learning created and existing under the laws of the State of Arkansas. The Court finds that a cause of action has been stated pursuant to the First and Fourteenth Amendments, 42 U.S.C. § 1983, and that jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343. The Complaint states a cause of action for deprivation of rights protected by the Constitution and Laws of the United States to plaintiff by defendants under color of law while in the performance of their duties pursuant to the laws of the State of Arkansas. 42 U.S.C. § 1983.

The basic evidentiary facts are virtually without dispute. Plaintiff was employed as a professor of social sciences in 1966 and since 1968 he had served as chairman of the Social Sciences Department. He received nine one-year renewals of his contract through the academic year 1975–1976. The plaintiff did not have tenure.

For the academic years 1974–1975 and 1975–1976 the College had a faculty evaluation procedure which was conducted by the Dean of the College. Plaintiff received excellent ratings on both of these evaluations.

In the Spring of 1975, Louis Ruman a professor in the Department of Social Sciences, made a complaint to federal authorities that the College was violating the conditions of an L.E.A.A. Grant. The complaint resulted in an investigation by the F.B.I. and, during December 1975, an F.B.I. agent interviewed President Easley and Chairman of the Board, Gene Raff, about the L.E.A.A. Grant violations. As a result

of the F.B.I. investigation, the College was required to refund to the Government the sum of $4,880.17.

At the meeting of the Board of Trustees on December 11, 1975, Chairman Raff inquired of President Easley if something could not be done to stop the letter writing by the College Faculty and Staff. President Easley suggested enforcement of an established policy which he designated as the Line Authority Policy. The policy was not reduced to writing and circulated to the Faculty. However, President Easley informed the faculty of the F.B.I. investigation and demanded that they follow the chain of command before writing any letters concerning college problems, at the faculty meeting held on January 7, 1976. Plaintiff was present at this faculty meeting. President Easley stated that the chain of command was Division Chairman, Dean of the College, President and Board of Trustees.[1]

On February 20, 1976, plaintiff wrote the following letter to the Arkansas Department of Finance and Administration:

"February 20, 1976

Mr. Ragland

Motor Vehicle Division

Department of Finance of Finance and Administration

Little Rock, Arkansas

Dear Mr. Ragland:

I wish to call to your attention a violation of the use of Dealer Tags. In Helena the Ritchey Buick, Pontiac, GMC, Inc. has leased two cars to Phillips County Community College and both carry dealer tags. This has been the practice for several years. These are commercial leases and are paid by the state. This practice not only evades sales tax and tag fees but local assessment as well.

Your investigation and correction of this matter would be appreciated. I also con-

1. The policy was by proclamation of President Easley. It was not considered and adopted by the Board of Trustees. It appears there was a study with reference to procedure for Phillips County Community College done in 1970, which referred to available sources for report-

ing by a member of the faculty. (Defendants' Exhibit No. 1) Subsequent to plaintiff's discharge, the Board adopted the policy of protocol which required utilization of policy of Line Authority.

sider this to be a confidential communication and will expect my confidentiality to be maintained.

Sincerely yours,

Marion L. Hickingbottom

620 St. Regis

West Helena, Ark. 72390"

These cars had been furnished to President Easley and his wife, who was also a faculty member, by the Board to increase their compensation, as they were receiving the maximum salaries allowed by law.

On February 24, 1976, at a meeting of the Division Chairmen, at which plaintiff was present, President Easley again strongly reiterated the policy of going through channels first before reporting to other sources. He also made it abundantly clear that any member of the faculty who failed to comply with this procedure would be subject to dismissal. The Division Chairmen were directed to tell all of the members of their respective departments about the policy, but the policy was not reduced to writing and circulated among the faculty members.

On March 8, 1976, Lt. Charles Logan of the Arkansas State Police came to the College to investigate plaintiff's complaint. While conversing with the officer about where he could locate plaintiff, President Easley learned of the contents of letter by reading it over the officer's shoulder. Lt. Logan was directed to plaintiff's office and inquired if plaintiff had written the letter to the Department of Finance and Administration. Plaintiff acknowledged that he had written the letter. The officer informed him that he wanted to let plaintiff know that the investigation was underway. As a result of the investigation, the cars leased to the College were subsequently properly licensed.

On March 9, 1976, within 24 hours of Lt. Logan's visit, plaintiff was summoned to President Easley's office where he was questioned about writing the letter to the Department of Finance and Administration, and plaintiff was also asked if he had written the letter to the federal authorities about the L.E.A.A. grant. Plaintiff admitted writing the letter to the Department of Finance and Administration, but denied writing the other letter. President Easley was visibly disturbed and angry, and the confrontation ended with a demand for plaintiff's resignation. Plaintiff refused to resign and employed counsel, who called President Easley and requested that plaintiff be afforded his procedural rights if disciplinary action was taken.

On April 2, 1976, President Easley wrote to Plaintiff and informed him that he intended to recommend to the Board that plaintiff's contract not be renewed for the following school year. Dr. Easley stated that he was doing this because plaintiff had been uncooperative with him and his staff, plaintiff was not maintaining the proper relationship with his students, and he had followed disruptive procedures designed to harm the College.

There was considerable correspondence between counsel for plaintiff and counsel for the Board about the exact nature of the charges against plaintiff over the next month. In a letter dated April 29, 1976, counsel for the defendants stated that plaintiff was being discharged because of violating the Line Authority Policy, which he set out in detail.

The Board of Trustees for the College held a hearing on May 10, 1976, to consider President Easley's recommendation that plaintiff's contract not be renewed. President Easley testified that plaintiff's failure to seek a solution to the problem through internal channels before writing the letter to the Department of Finance and Administration was the basis for his recommendation. After the hearing the Board voted unanimously to accept President Easley's recommendation not to rehire plaintiff.

As the result of the nonrenewal of his appointment at Phillips County Community College, Hickingbottom was not able to obtain comparable teaching positions at other schools, although he made several applications. He did obtain a job as Headmaster of Jefferson Christian Academy, a private elementary and secondary school. In 1978, after completing the 1977–1978 school year,

plaintiff went into the construction business and no longer sought to obtain comparable employment. Since entering the construction business, plaintiff has failed to stay current with the developments in his field.

■ A non-tenured faculty member has no right to continued employment beyond the duration and terms of his contract. The College is free not to rehire him for good reasons or for poor reasons or even "for no reason whatever." *Cooper v. Ross*, 472 F.Supp. 802 (E.D.Ark.1979); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 283, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1971). However, the decision not to rehire may not be predicated on the teacher's exercise of the constitutionally protected right of the First Amendment guarantee of freedom of speech which was made applicable to the states by the Fourteenth Amendment. *Cooper v. Ross*, supra; *Mt. Healthy City School District Board of Education v. Doyle*, supra; *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 685, 17 L.Ed.2d 629 (1969); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

■ When a non-tenured teacher alleges that he was not rehired in violation of his First Amendment rights, he bears the initial burden of establishing that his conduct was constitutionally protected and that this protected conduct was a "substantial factor" or a "motivating factor" in the college's decision not to reappoint him. If this burden is sustained, then the college has the burden of showing by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct. *Mt. Healthy City School District Board of Education*, supra.

The United States Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968), held that, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment.

■ As in *Pickering v. Board of Education*, supra, plaintiff's statements involved matters of public concern. Certainly, the potential violation of the law should always be a matter of public concern. It is the duty of everyone to assist in the detection of crime; and if he knows facts that tend to show that a crime has been committed, it is not only proper, but it is his duty to communicate them to the proper officer. *Miller v. Nuckolls*, 77 Ark. 64, 72, 91 S.W. 759 (1905); *In Re Quarles and Butler, Petitioners*, 158 U.S. 532, 535, 15 S.Ct. 959, 960, 39 L.Ed. 1080 (1895); *Swaaley v. U. S.*, 376 F.2d 857, 180 Ct.Cl. 1 (1967); *Williams v. Allen*, 439 F.2d 1398 (5th Cir. 1971).

The Court is persuaded and concludes that the writing of the letter was a substantial or motivating factor in the decision not to reappoint Hickingbottom. Several factors point to this conclusion, including the timing of the nonrenewal decision; the fact that in 1974 and 1975 he was rated as an outstanding instructor, did a good job as department chairman, and had been recommended for continued employment; that Dr. Easley admitted that he probably would have recommended reemployment of plaintiff but for this incident, even though there had been differences and he had some reservations; that Dr. Easley admitted he became very upset upon reading the letter; and that Dr. Easley admitted that the writing of the letter was a motivating factor in the dismissal of plaintiff.

Plaintiff having established that the protected activity was a substantial or motivating factor in his dismissal, and defendants admitting that plaintiff had established a prima facie case, the burden shifted to the College to show by a preponderance of the evidence that it would have reached the same decision, even in the absence of the protected conduct. *Mt. Healthy City School District Board of Education v. Doyle*, supra.

The College contends that Hickingbottom was not rehired because he failed to follow the Line Authority Policy which required him to "check his information for accuracy" before submitting his letter to the Depart-

ment of Finance and Administration. The defendants assert that the policy is reasonable and supported by *Pickering v. Board of Education*, supra, wherein the Court states:

"We are thus not presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operation of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts. Accordingly, we have no occasion to consider at this time whether under such circumstances a school board could reasonably require that a teacher make substantial efforts to verify the accuracy of his charges before publishing them." 391 U.S. at 572, 88 S.Ct. at 1736.

In footnote 4, which immediately follows this quotation the Court states:

"There is likewise no occasion furnished by this case for consideration of the extent to which teachers can be required by narrowly drawn grievance procedures to submit complaints about the operation of the schools to their superiors for action thereon prior to bringing the complaints before the public." 391 U.S. at 572, 88 S.Ct. at 1736.

On this particular point, Justice White, in a footnote to his separate opinion states:

"The Court does not elaborate upon its suggestion that there may be situations in which, with reference to certain areas of public comment, a teacher may have special obligations to his superiors. It simply holds that in this case, with respect to the particular public comment made by Pickering, he is more like a member of the general public and, apparently, too remote from the school board to require placing him in any special category. Further, as I read the Court's opinion, it does not foreclose the possibility that under the First Amendment a school system may have an enforceable rule applicable to teachers, that public statements about school business must first be submitted to the authorities to check for accuracy." 391 U.S. at 582 and 583, 88 S.Ct. at 1742.

The last sentence quoted above is a separate opinion of Mr. Justice White and is not a part of the opinion reached by the majority of the Court. To the extent that the separate opinion is applicable to this case it is noted there was not a written policy established by the Board, but a pronouncement of a policy by President Easley as a result of a previous incident by another teacher.

The defendants also contend that legitimate and compelling institutional needs may sometimes justify placing some restrictions on the exercise of First Amendment rights in the educational environment. *Clark v. Mann*, 562 F.2d 1104 (8th Cir. 1977); *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In addition, the defendants cite numerous 8th Circuit opinions involving students which held that school districts have the right to make reasonable rules.

The Court recognizes that the system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board officials. The Court also recognizes that a college has the right to select its faculty, and to make reasonable rules and regulations. However, the Courts have intruded into the academic community on occasion to ensure the vigilant protection of constitutional freedoms, which is nowhere more vital than in the community of American schools. *Shelton v. Tucker*, supra; *Healy v. James*, supra.

The problem in a case of this nature is to arrive at a balance between the interest of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the College, as an employer, in promoting the efficiency of public services it performs through its employees. *Pickering v. Board of Education*, supra.

The Court feels that the interest of society in encouraging teachers, as well as all citizens, to speak out and report violations of the law far outweighs the interest of the

College and the Board of Trustees in preventing embarrassment. This case involves the enforcement of the laws of the State of Arkansas, and as previously stated, it is the duty of every citizen to report violations of the law to the proper officer. *Miller v. Nuckolls*, supra. It is noted that Hickingbottom did not publish the perceived law violation in a newspaper or some other type of mass communication. He reported it to the proper authorities, and also asked that it be a confidential communication.

■ The Court is of the opinion from the record in this case, and in view of the limited circumstances as described by the record, that it was not permissible for the defendants to summarily discharge the plaintiff or to deny the plaintiff a renewal of his contract solely on the basis of his act of reporting the actual violation of state law prior to calling it to the attention of certain persons in the chain of command listed in the President's announced Line Authority Policy. As already concluded herein, the plaintiff was exercising his First Amendment rights in reporting to appropriate officials an obvious violation of the law. The Court further concludes that this protected action of the plaintiff was a "substantial or motivating factor" in the decision to deny the plaintiff reappointment as a member of the faculty for another year. The Court is of the opinion that the plaintiff met his burden as required by law, but the College has failed to meet its burden by a preponderance of the evidence that the same non-reappointment decision would have been made absent Hickingbottom's exercise of First Amendment rights.

The Court further concludes that Mr. Easley, President of the College, and the Board of Trustees of the College were acting in their official capacities in denying reappointment of the plaintiff for the ensuing year which was an official act of the College. Therefore, the defendant College is liable for the official actions resulting in the plaintiff's constitutional deprivation. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

The Court also finds, as disclosed by the record, that the plaintiff ultimately obtained employment for the ensuing school year 1976–1977 as headmaster of the Jefferson Christian Academy in Birmingham, Alabama in an effort to mitigate any damages he sustained by seeking a position in the same field of employment. The plaintiff continued the employment with the Jefferson Christian Academy through the school year 1977–1978. At the end of the second school year he resigned his position as headmaster and entered the construction business as self-employed. He no longer sought employment in the field of education and, therefore, the Court concludes that he failed to continue to appropriately mitigate his damages resulting from failure of the College to renew his contract for the school year 1976–1977.

Having reached the conclusion that the action of the President and the Board of Trustees of the College in failing to renew the plaintiff's contract was impermissible, the Court now turns to the question of relief the plaintiff should have as disclosed by the record. The plaintiff is seeking an award of back pay from the date of his dismissal as a member of the faculty of the College to the date judgment is entered in this case. He requests that he receive back pay to the extent of the difference between his actual earnings on a calendar basis and what he would have earned had he not been dismissed and had remained at the College. Additionally, the plaintiff seeks reinstatement as a member of the faculty that he may continue as an instructor in social science.

■ The Court is of the opinion and concludes that the proper basis for an award of back pay would be the difference between his actual earnings as headmaster of the Jefferson Christian Academy in Birmingham, Alabama for the school years of 1976–1977 and 1977–1978 and what he would have earned for these two years had he remained as a professor at the College. The award should include salary related

benefits which would have accrued to plaintiff had he remained as a member of the faculty of Phillips County Community College.

With reference to the plaintiff's claim to reinstatement, it is the opinion of the Court that if the plaintiff has engaged in educational pursuits and opportunities to meet current requirements of an instructor in social science in such an institution of higher learning in the state of Arkansas, he should be reinstated as a member of the faculty. It should be noted that it has been two years since he was associated with an educational environment and four years since he taught social science at the college level. It will be necessary for him to show that he can meet current requirements of a person continuously engaged in this field of education.

Counsel for the plaintiff will prepare an appropriate judgment in accordance with the Court's findings and conclusions, submit it to counsel for the defendants for such response as counsel may make, and to the Court for the Court's consideration.

Furthermore, counsel for the plaintiff will submit an itemized statement of service for justification for attorney's fee claimed in the case. Counsel for the defendants may file a response thereto within 10 days thereafter. Should counsel for the parties stipulate as to reasonable attorney's fee in the case, such statements would be unnecessary.

Upon receipt of proposed judgment and stipulation the Court will enter such judgment justified pursuant to the Court's findings and conclusions as included in this memorandum opinion.