**James Lee PARSONS, Plaintiff,**

v.

**Northwest Arkansas Community College President Bob C. BURNS, and NWACC Board of Trustees, Neff Basore, Charles H. Brannon, Bob Crofton, Doylene Fuqua, Evalena Mayo, Dick Trammel, Carolyn Walton, Don White, and Craig Young, NWACC Board Members, Defendants.**

Civ. No. 93–5098.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Sept. 14, 1993.

Thurman A. Ragar, Jr., Booth, Ragar, & Honeycutt, Van Buren, AR, for plaintiff.

Jeff A. Bell, Office of Attorney General, Little Rock, AR, George R. Rhoads, Matthews, Campbell & Rhoads, Rogers, AR, for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This case is currently before the court on the defendants' motion to dismiss, to strike, and for more definite statement. The court sought and has received additional information from the parties.

First, defendants move, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss the complaint on the grounds that this court lacks subject matter jurisdiction based on the Eleventh Amendment to the United States Constitution. In connection with this argument, the court is asked to decline to exercise pendent jurisdiction over the state law claims and dismiss the entire action. Second, defendants move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of the state law claims on the grounds that the complaint fails to state a claim for which relief can be granted. Third, defendants move, pursuant to Rules 19(a) and 12(b)(7) of the Federal Rules of Civil Procedure, for dismissal of the portion of the complaint seeking compensation on the part of plaintiff's wife as she is not a party to this lawsuit. Fourth, defendants move, pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, for dismissal of the complaint because it fails to give a short and plain statement of the plaintiff's claim. Fifth, defendants move, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, to strike certain portions of the complaint. Finally, defendants move, pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, for a more definite statement in regard to certain portions of the complaint.

## Background.

Plaintiff, James Lee Parsons, filed this action on June 14, 1993, naming as defendants Northwest Arkansas Community College (NWACC) President Bob C. Burns and the Board of Trustees of NWACC. The Board of Trustees currently consists of Neff Basore, Charles Brannan, Bob Crafton, Doylene Fuqua, EvaLena Mayo, Dick Trammel, Carolyn Walton, Don White and Craig Young. Plaintiff proceeds *pro se* and *in forma pauperis.*

The complaint is thirteen pages long. The court will attempt to summarize the allegations.[1] On August 1, 1990, plaintiff assumed a position as the division chair of the science, mathematics, and physical education department of NWACC. Parsons taught three classes in anatomy and physiology. Parsons alleges that during this same period of time he was president of the Arkansas Teachers' Association (ATA). Between November 5, 1990, and January 29, 1991, plaintiff states that various articles appeared in the local and statewide newspapers regarding his involvement in ATA and certain legislative bills ATA had proposed. One such bill was designed to prohibit any increase in salaries for public school superintendents or assistant superintendents until certain conditions providing money for teacher salary increases had been met.

Plaintiff alleges that on February 5, 1991, he was called to Dr. Burns' office where Dr. Burns told Parsons that capping the superintendents' pay was not a good idea because the superintendents of Bentonville and Rogers school systems were on the board of trustees. Plaintiff states he was told that he should resign as president of ATA and should distance himself from the organization. Parsons states he followed the directive of Dr. Burns and became inactive in ATA.

On September 24, 1991, plaintiff met with Dr. Burns. Plaintiff informs the court that a memorandum dated September 30, 1991, concerning the meeting advised the plaintiff to stay out of potentially controversial political issues. Plaintiff alleges the memorandum further stated he must avoid further organized controversial political activities during regular work hours and that the college had been negatively impacted because of the plaintiff's activities.

On March 20, 1992, Parsons announced that he would run for state senate. On March 23, 1991, the complaint alleges plaintiff was demoted from division chairman and his salary was reduced because he would not have time to be division chair if he was running for office. The court assumes this demotion occurred on March 23, 1992, since Parsons states he announced his candidacy on March 20, 1992. Parsons was told he would have to vacate his office and move to another office space. Parsons states he was informed by the department chair, Tess O'Brien, that he had until July 18 or July 19, 1992, to move.

On May 15, 1992, plaintiff states he signed a contract for the 1992–93 school year. Parsons received a memo dated April 28, 1992, which referred to the September 24, 1991, meeting and among other things indicated Parsons would probably have no choice but to resign if he was elected to the state senate.

On June 2, 1992, plaintiff received a memorandum from Dr. Katherine Villard indicating that Parsons had been accused by a student of violating the Buckley Amendment. Dr. Villard advised that any repeat of this practice might result in a recommendation that plaintiff be terminated.

On June 23, 1992, the NWACC board of trustees developed a political leave policy. On July 17, 1992, plaintiff received a call that his personal belongings had been removed from the office and placed in the hall.[2] On July 23, 1992, Parsons held a press conference regarding this incident and released the memorandums dated September 30, 1991,

---

1. In reciting the facts as alleged in the complaint, the court makes no findings of fact regarding any of the alleged incidents.

2. The complaint alleges the phone call occurred on July 17, 1993. The court assumes this is a misstatement.

and April 28, 1992.[3]  Dr. Burns in a statement to the media responded that Parsons had used school time and resources to further his political activities.  On August 2, 1992, a news article appeared indicating Parsons' belief that the political leave policy did not require demotions and that no reduction in salary is to be made under the policy unless an instructor asked for leave.

On August 3, 1992, Parsons was sent a written warning in which Dr. Burns indicated Parsons was being insubordinate, had bypassed the chain of command, and had made false accusations against the college.  The warning further indicated grounds existed for the discipline of Parsons.

On January 1, 1993, Parsons received a satisfactory evaluation from his department chair.  On January 26, 1993, Parsons was sent by certified letter a notice that his contract would not be renewed.  Parsons requested and received a hearing before the board of trustees.  The board unanimously voted not to renew the contract for the 1993–1994 school year.

Parsons contends that these activities violated his rights under the First Amendment to the United States Constitution.  Specifically, he alleges he has been denied his right to peaceful assembly and that he has been retaliated against for exercising his right of free speech.  Parsons further contends that his demotion and firing where not done in accordance with the college policy manual.  He requests damages for both himself and his wife, reinstatement, and punitive damages.

### Eleventh Amendment Immunity.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Thus, the Eleventh Amendment mandates that an unconsenting state is immune from suits brought in federal court by citizens of another state.  *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* —— U.S. ——, —— – ——, 113 S.Ct. 684, 688–89, 121 L.Ed.2d 605 (1993) (Eleventh Amendment withdrawal of jurisdiction effectively confers immunity from suit).  The extent of Eleventh Amendment immunity is a question of federal law.  *Howlett v. Rose,* 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990).[4]  Even though the amendment by its terms does not appear to bar suits against a state by her own citizens, the Supreme Court has consistently held that an unconsenting state is also immune from suits brought in federal court by her own citizens as well as by citizens of another state.  *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Great Northern Life Ins. Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944).

The judiciary has also determined that the Eleventh Amendment cloak of immunity covers more than just the state itself.  An agency, commission, or board, for example, may also be immune from suit if the entity bears such a close relationship to the state that a suit against the entity is in reality a suit against the state.  *Edelman, supra; Greenwood v. Ross,* 778 F.2d 448 (8th Cir.1985).  "It is not necessary that the state be named as a party, only that the named party is, in actuality, the *alter ego* of the state." *Blake v. Kline,* 612 F.2d 718, 721 (3d Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980).  This doctrine, sometimes referred to as the arm-of-the-state doctrine, bestows sovereign immunity on state governmental agencies that operate as alter egos or instrumentalities of the state.  It has been noted that:

> Courts classify state bodies according to a dichotomy, labelling the entities as either arms of the state or as political subdivisions.  Whereas arms of the state may not be haled into federal court for alleged

---

3.  The complaint states the press conference occurred on July 23, 1993.  The court believes this is a misstatement.

4.  The state may, of course, waive its Eleventh Amendment immunity by giving its consent to being sued.  *Parden v. Terminal Ry. of Ala. State Docks Dept.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

wrongdoing because of their close nexus with the state, political subdivisions such as counties and cities do not enjoy sovereign immunity because of their autonomy from the state. Between arms of the state and local municipalities, however, lies a wide range of unconventional government-chartered entities that possess attributes of both political subdivisions and state agencies.

Alex E. Rogers, *Note: Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine*, 92 Colum.L.Rev. 1243, 1243 (June 1992).

■ Furthermore, the Eleventh Amendment bars claims for damages against a state official acting in an official capacity, even if the official's conduct was illegal under federal law. *Papasan v. Allain*, 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986). Moreover, the Eleventh Amendment prohibits a federal court from granting relief against state officials for conduct that violates only state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

■ In *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that the Eleventh Amendment does not bar a suit to enjoin as unconstitutional a state official's action. "This holding was based on a determination that an unconstitutional state enactment is void and that any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such action is a nullity." *Papasan*, 478 U.S. at 276, 106 S.Ct. at 2939. "*Young*, however, does not insulate from Eleventh Amendment challenge every suit in which a state official is the named defendant. In accordance with its original rationale, *Young* applies only where the underlying authorization upon which the named official acts is asserted to be illegal." *Id.* at 277, 106 S.Ct. at 2940.

"Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defen-

dant." *Id.* at 278, 106 S.Ct. at 2940. However, damages may be awarded when a state official is sued and held liable in his individual capacity. *Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974). In determining whether a suit is barred by the Eleventh Amendment the Supreme Court has stated that "we look to the substance rather than to the form of the relief sought ... and will be guided by the policies underlying the decision in *Ex Parte Young*." *Papasan*, 478 U.S. at 279, 106 S.Ct. at 2941.

The Supreme Court recently summarized the teachings of *Ex parte Young* in the following terms:

> The doctrine of *Ex parte Young*, which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity. Moreover, the exception is narrow: it applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, and has no application in suits against States and their agencies, which are barred regardless of the relief sought. Rather than defining the nature of Eleventh Amendment immunity, *Young* and its progeny render the Amendment wholly inapplicable to a certain class of suits. Such suits are deemed to be against officials and not the States or their agencies, which retain their immunity against all suits in federal court.

*Puerto Rico Aqueduct*, —— U.S. at —— ——, 113 S.Ct. at 688–89 (citations omitted).

■ A review of the complaint is necessary to determine in what capacity the individual defendants are being sued. "Generally, individual-capacity suits involve actions taken by governmental agents outside the scope of their official duties. Official-capacity suits typically involve either allegedly unconstitutional state polices or unconstitutional actions taken by state agents possessing final authority over a particular decision." *Nix v. Norman*, 879 F.2d 429 (8th Cir.1989). After carefully reviewing the complaint, we

conclude the plaintiffs have sued the named defendants only in their official capacities. The complaint is not sufficiently clear to give the individual defendants notice that they are being sued in their individual capacities.

The determination of whether a particular educational entity is an arm-of-the-state must necessarily be made on a case by case basis upon review of the individual state laws involved. *Ambus v. Granite Bd. of Education,* 995 F.2d 992, 994 (10th Cir.1993) (Utah school districts not arms of the state). *See also Mitchell v. Los Angeles Community College District,* 861 F.2d 198 (9th Cir.1989), *cert. denied,* 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989) (community college was a state entity); *Hander v. San Jacinto Junior College,* 519 F.2d 273 (5th Cir.1975) (community college not immune from suit); *Folse v. Delgado Community College,* 776 F.Supp. 1133 (E.D.La.1991) (community college and board entitled to Eleventh Amendment immunity). Defendants suggest that because the University of Arkansas has been found to be a state entity for Eleventh Amendment purposes that NWACC is also entitled to Eleventh Amendment immunity. *See Assaad–Faltas v. University of Arkansas for Medical Sciences,* 708 F.Supp. 1026 (E.D.Ark.1989). The undersigned has previously held in an unpublished opinion that the University of Central Arkansas was entitled to Eleventh Amendment immunity. *See House v. University of Cent. Arkansas,* LR–C–87–564 (E.D.Ark. January 4, 1988). However, the court believes that neither of these decisions are determinative of the issue currently before the court; that is, whether the community college is entitled to Eleventh Amendment immunity.

■ Typically, the determination of whether a given entity is an arm-of-the-state is made by resort to a number of factors including the following: the state-law characterization; the degree of state control and supervision over the entity; whether the entity has authority to sue and be sued in its name; the source of funds for the entity including the ability of the entity to issue bonds and levy taxes on its own behalf; the degree of local autonomy the entity enjoys; whether the entity is concerned primarily with local, as opposed to statewide, problems; whether the entity has the right to hold and use property; and whether the entity performs governmental or proprietary functions. *See e.g., Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Folse v. Delgado Community College,* 776 F.Supp. 1133, 1137 (E.D.La.1991).

The Eighth Circuit, in remanding *Greenwood v. Ross, supra,* placed emphasis on two factors in determining whether an entity is the *alter ego* of the state for Eleventh Amendment purposes. The panel directed the district court to:

> [e]xamine the particular entity in question and its powers and characteristics as created by state law to determine whether the suit in reality is a suit against the state. Courts typically look at the degree of local autonomy and control and most importantly whether the funds to pay any award will be derived from the state treasury.

*Greenwood,* 778 F.2d at 453, *quoting, Laje v. R.E. Thomason General Hospital,* 665 F.2d 724, 727 (5th Cir.1982).

■ Many courts addressing this issue have concentrated on whether the defendant has such independent status that a judgment would not impact the state treasury. With regard to the impact on the state treasury, it has been noted:

> That some public funds might be implicated is not dispositive for Eleventh Amendment purposes. Even though judgments against municipalities must invariably be paid from public funds, such suits are not barred by the Eleventh Amendment. Further, an entity's receipt of some state funding does not mean that damage awards must be considered to have been paid from the state treasury. The proper analysis focuses on whether the damage award would be paid *directly* by the state treasury, rather than indirectly through commingled state and local funds or state indemnification provisions.

*Ambus v. Granite Bd. of Educ.,* 995 F.2d 992, 996 (10th Cir.1993). The factors that weigh heavily on the question of financial autonomy of an educational institution are the extent of

state funding, the state's oversight and control of the college's fiscal affairs, the college's ability independently to raise funds, whether the state taxes the college, and whether a judgment against the college would result in the state increasing its appropriations to the college. *Kashani v. Purdue University,* 813 F.2d 843, 845 (7th Cir.1987), *cert. denied,* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987).

Amendment 52 to the Arkansas Constitution invested the general assembly with the authority to establish districts to furnish community college instruction and technical training. Ark. Const. amend. 52 (1964). Section 1 provides that "[t]he General Assembly shall prescribe the method of financing such community college and technical institutes, and may authorize the levy of a tax upon the taxable property in such districts for the acquisition, construction, reconstruction, repair, expansion, operation, and maintenance of facilities therefor." Ark. Const. amend. 52 § 1 (1964). Section 2 states that no such district shall be created and no tax levied without the approval of a majority of the qualified voters in the proposed district. Ark. Const. amend. 52 § 2 (1964).

> The term community college is defined as an educational institution established or to be established by one (1) or more counties or cities of the state offering a comprehensive program designed to serve the post-secondary educational needs of its district and the state including specifically, but without limitation, occupational programs of varying types and levels of difficulty, the first two (2) years of a baccalaureate degree, community service offerings, and student guidance and counseling services.

Ark.Code Ann. § 6-61-501(1) (Supp.1991).

Funds for the "general operation of an adequate comprehensive educational program" are provided by the state. Ark.Code Ann. § 6-61-601 (1987). The district may, if it wishes to spend larger sums of money than the state funds provide, levy millage to provide additional operation funds. *Id.* The tax authorized by Amendment 52 is by statute limited to ten (10) mills on the taxable real and personal property in the district. Ark. Code Ann. § 6-61-503 (1987). The tax is a continuing levy and is collected in the manner provided by law for the collection of county general taxes and is remitted to the district. Ark.Code Ann. § 6-61-517 (1987). The district may also issue bonds. Ark.Code Ann. § 6-61-604 (1987). For the current fiscal year, 20.2% of the college's budget is provided by state funds and 33.3% is provided by local taxes. *Affidavit of Dr. Bob C. Burns, President of NWACC* (hereinafter Burns aff.). The current millage rate for the college's local tax is three mills. *Burns. aff.*

A separate division within the State Board of Higher Education was created for the community or junior colleges. Ark.Code Ann. §§ 6-61-501(5), 6-61-504 (1987). The State Board of Higher Education acts as the statewide coordinating board for the community colleges. Ark.Code Ann. § 6-61-505(a) (1987). The duties of the State Community College Board are set out by statute. Ark. Code Ann. § 6-61-505(c) (1987). Defendants inform the court that the State Board participates in the actual day-to-day operation of the college. *Burns aff.* Defendants have provided the following examples of participation by the State Board: approval of the college's name; approval of the wording on ballots for millage elections; approval of the creation of the college contingent on an appropriation from the legislature; and approval of degree programs. *Id.* The State Board of Higher Education itself consists of thirteen members appointed by the governor and confirmed by the Senate. Ark.Code Ann. § 6-61-201(a)(1) (Supp.1991).

Local control of each community college is vested in a local board composed of nine members who are residents and qualified electors of the community college district. Ark.Code Ann. § 6-61-520(a) (1987). The members of the board are elected on a nonpartisan basis for six-year terms by the qualified electors of the community college district. Ark.Code Ann. § 6-61-520(b)-(c) (1987). Vacancies on the board due to death, resignation, or other causes are filled by appointment of the governor. Ark.Code Ann. § 6-61-520(d)(1) (1987).

The local board is empowered, *inter alia:* (1) to select its officers; (2) to develop, with the advice of the State Community College

Board, the educational program; (3) to appoint, with the advise of the State Community College Board, a president and fix the compensation and terms of office of the president who shall be the executive officer of the local board and the college; (4) to appoint, upon nomination of the president, members of the administrative and teaching staffs and to fix their compensation and terms of employment; (5) to enter into contracts; (6) to accept grants or contributions of money to be used for any of its purposes; (7) to acquire, own, lease, use, and operate property; and (8) to exercise the right of eminent domain.

The defendants inform the court that both the Arkansas Department of Finance and Administration and the Arkansas Attorney General have determined that the Arkansas community colleges are state agencies. Neither determination, however, dealt with the issue of Eleventh Amendment immunity which is a determination of federal not state law. The determination made by the Department of Finance and Administration dealt with whether the community college was exempt as a state agency from paying Arkansas real estate transfer tax. The determination made by the Arkansas Attorney General was in connection with whether a community college qualified as an agency of the state for purposes of grants payable from the Natural and Cultural Resources Grants and Trust Fund. *Burns aff.*

NWACC states it is regulated or must answer to the following state agencies: State Board of Higher Education; Office of Personnel Management; Department of Finance and Administration; Attorney General's Office; Governor's Office; and Office of Computer Services. *Id.* Additionally, the salary levels, maximum salaries, positions that can be filled, programs that can be offered, purchasing procedures, and accounting procedures are all regulated by some agency of the State. *Id.* The court is also informed that approval of the State Department of Finance and Administration was necessary in order for the college to establish a petty cash fund. *Id.* Finally, NWACC points out state

approval was required in order for the college to hire a bond adviser. *Id.*

■ After analyzing the structure of NWACC and the relevant Arkansas statutes, we conclude the community college is not entitled to Eleventh Amendment immunity. Although NWACC has been created pursuant to a constitutional amendment and statutes of the State of Arkansas and is regarded as part of the system of higher education under the supervision of the State Board of Education, we conclude that on the record before us NWACC is more like a school district or political subdivision than it is like an arm of the state. While the local board must operate within the guidelines and under the supervision of the State Board of Education which is comprised of members appointed by the Governor, many of the functions and decisions of the college are within the control of the local elected board.

In comparison to the University of Arkansas and the University of Central Arkansas the community college is significantly more autonomous. For instance, NWACC has the power to tax, is governed by a local elected board with the supervision of a state board rather than being directly governed by a board appointed by the governor, and has the power to acquire, own lease, use and operate property while all property acquired by the state Universities is itself titled in the name of the state. *See* Ark.Code Ann. § 6–67–103 (1987).[5]

The college currently receives only 20.2% of its funding from the state and has the power to levy taxes in its own behalf. The local funds derived from the ad valorem tax comprise a larger percentage of the budget than the funds provided by the state. In sum when the court balances the factors set forth above in light of NWACC's situation, we conclude that NWACC is not entitled to Eleventh Amendment immunity. As the court declines to dismiss the federal claim, we will retain jurisdiction over the state law claims.

---

**5.** The University of Arkansas and the University of Central Arkansas are listed as "state colleges" in various statutes. *See e.g.,* Ark.Code Ann. § 6–62–201 (1987).

### Failure to State a Claim.

■ Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of the state law claims on the grounds that the complaint fails to state a claim for which relief can be granted. A Rule 12(b) motion is to be read as a whole, *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and it is to be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Bennett v. Berg*, 710 F.2d 1361 (8th Cir.1983), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). In addition, complaints are to be "liberally construed in favor of the plaintiff." *See Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969), and *United States v. Advance Machine Corp.*, 547 F.Supp. 1085, 1088 (D.Minn.1982). It has also been said that all facts pleaded in the complaint are taken to be true for Rule 12(b)(6) purposes, *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976), and all reasonable inferences from facts pleaded in the complaint are to be drawn and deemed to be true. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d Ed. 1990).

Relying on *Hickingbottom v. Easley*, 494 F.Supp. 980 (E.D.Ark.1980) defendants argue there is no basis for a non-tenured college teacher to pursue a wrongful discharge action. *Hickingbottom* involved a claim brought by a former college professor against the college officials. Hickingbottom alleged that his employment was wrongfully terminated in violation of his right of free speech guaranteed by the First and Fourteenth Amendments. *Hickingbottom*, 494 F.Supp. at 981. The court stated:

> A non-tenured faculty member has no right to continued employment beyond the duration and terms of his contract. The College is free not to rehire him for good reasons or for poor reasons or even "for no reason whatever." However, the decision

not to rehire may not be predicated on the teacher's exercise of the constitutionally protected right of the First Amendment guarantee of freedom of speech which was made applicable to the states by the Fourteenth Amendment.

*Id.* at 984 (citations omitted).

■ Arkansas has long adhered to the doctrine of employment-at-will. An exception is recognized if an employee is fired in violation of well-established public policy. *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). The public policy exception is regarded as a contract cause of action. *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988). The measure of damages is the sum of lost wages and other benefits from termination until the day of trial, less the sum of wages that the employee earned or could have earned through mitigation. *Id.* *See also* Howard W. Brill, *Arkansas Law of Damages* § 20–2 at p. 279 (2d Ed.1990). Clearly a termination in violation of an individual's constitutional rights can form the basis of both a federal claim and a state wrongful discharge claim.

Therefore, the court denies the Rule 12(b)(6) motion with respect to a state wrongful discharge claim. The court believes the plaintiff may assert a claim under the public-policy exception to the employment-at-will doctrine. The court leaves for later determination the issue of whether any such damages would be duplicative of the damages sought under the federal claim.

The court does not read the complaint to assert any tort causes of action; rather, the complaint appears to assert a constitutional claim and a state wrongful discharge claim based on the public policy exception to the employment-at-will doctrine. The fact that plaintiff has asked for certain elements of damage which are normally only available in tort cases does not alter the court's analysis; the court believes this is a result of plaintiff's unfamiliarity with the law and the types of damages available for particular causes of action. For that reason, we will not address defendants arguments that they are immune from suit in tort under Ark.Code Ann. § 19–10–305(a) (1987).

### Failure to Join Indispensable Party.

Defendants move pursuant to Rules 19(a) and 12(b)(7) of the Federal Rules of Civil Procedure for dismissal of the portion of the complaint seeking compensation on the part of plaintiff's wife as she is not a party to this lawsuit. This portion of the motion will be granted. The plaintiff may not seek damages on behalf of his wife.

### Failure to Comply with Rule 8(a)(2).

Defendants move for dismissal on the grounds that the complaint fails to give a short and plain statement of the plaintiff's claim. Rule 8 provides in part:

A pleading which sets forth a claim for relief ... shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks.

Fed.R.Civ.P. 8(a). The purpose is simply to give the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved. The court is to read pro se pleadings with a generous eye. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Coleman v. Turner,* 838 F.2d 1004, 1005 (8th Cir.1988).

The court believes the complaint gives the defendants fair notice of the nature and basis of the claims. This portion of the motion is denied.

### Motion to Strike.

Defendants move to strike the claim for punitive damages, the claim for damages to plaintiff's wife,[6] and any other claim for damages other than the request for back pay and reinstatement. A motion to strike is the appropriate remedy for the elimination of redundant, immaterial, impertinent, or scandalous matter in a pleading. *See generally,* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (2d Ed.1990). Motions to strike are not favored and are infrequently granted.

The court will determine at the proper time the appropriate elements and measure of damages. The motion to strike is denied.

6. The court has already ruled that plaintiff may

### Motion for More Definite Statement.

Finally, defendants move, pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, for a more definite statement in regard to certain portions of the complaint. In order to survive a Rule 12(e) challenge, a pleader must have set forth his cause of action in a sufficiently intelligible manner for the court to be able to make out one or more potentially viable legal theories on which the action may proceed. The burden is on the movant to demonstrate that the complaint is so vague or ambiguous that they cannot respond, even with a simple denial, in good faith or without prejudice to them.

The defendants have failed to meet their burden. The court does believe, however, that plaintiff should be directed to amend his complaint to specifically state whether he is seeking to bring a claim for a wrongful demotion as well as a claim for wrongful discharge in violation of the First Amendment.

### Conclusion.

For the reasons stated herein, the defendants' motion will be granted in part and denied in part. A separate order in accordance herewith will be concurrently entered.

not seek damages on his wife's behalf.