Patricia MANSON, Plaintiff,

v.

LITTLE ROCK NEWSPAPERS, INC.
d/b/a Arkansas Democrat–
Gazette, Defendant.

No. LR–C–97–560.

United States District Court,
E.D. Arkansas,
Western Division.

March 9, 1999.

G. Randolph Satterfield, Satterfield Law Firm, Jack R. Kearney, Little Rock, for Plaintiff.

J. Leon Holmes, John E. Tull, III, Katharine R. Cloud, Williams & Anderson, Little Rock, for Defendant.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

Patricia Manson filed this lawsuit against her former employer, Little Rock Newspapers, Inc., d/b/a *Arkansas Democrat–Gazette,* alleging that she was terminated in violation of the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act. Manson also alleges that she was wrongfully discharged in violation of Arkansas law.[1] Trial is currently set to begin on March 15, 1999.

*Background.*

Manson is now a forty-two year old newspaper reporter who worked for the defendant between September of 1993, until her termination on December 26, 1996 (when she would have been barely 40). Manson was a "general assignment reporter" for the first six months of her employment with the defendant, which meant she covered "a little bit of everything" and did not have a particular beat. *Patricia Manson's Deposition,* at 83. While Manson was a general assignment reporter, she was supervised by Lisa Thompson and Glen Chase. Manson stated at her deposition that "as a general rule" she did not perceive that she was being discriminated against because she was a woman during her term as a general assignment reporter. *Patricia Manson's Deposition,* at 84–85.

Manson does believe, however, that she was discriminated against by David Bailey, the City Editor, during her first six months as a general assignment reporter. Specifically, Manson asserts that because she did not socialize with Bailey, *i.e.,* she did not occasionally go out for a beer with him, she was not assigned to certain stories. *Id.,* at 85. Manson stated she felt like Bailey did not like her based on "the way he talked to [her]" and "the tone of voice he used." *Id.,* at 88. Manson further stated that she felt Bailey was threatened by her because she was an experienced female reporter who was good at her job. *Id.* Manson asserts that Bailey discriminated against "experienced female reporters." *Id.,* at 89. Manson was in her "late thirties" when she alleges Bailey began discriminating against her because of her sex and her age. *Id.*

Manson asserts that Bailey also discriminated against David Kern and Bobbie Nesbitt because they were experienced reporters, *i.e.,* "over forty" years old. *Id.,* at 90. Bailey denies Manson's accusations and asserts that David Kern resigned February 13, 1995, following an unsatisfactory

---

1. Manson also asserted a claim for outrage. The court dismissed that claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure in an order filed May 13, 1998.

evaluation by Chase, his supervisor. *David Bailey's Affidavit,* at ¶ 13. Bailey further asserts that Bobbie Ridlehoover (same person as Bobbie Nesbitt) was a white female who was terminated in December of 1993 for unsatisfactory work performance. *David Bailey's Affidavit,* at ¶ 12. Bailey states that he did not make the decision to terminate Ridlehoover and expressed uncertainty at the time as to whether termination was the correct decision. *Id.*

In April of 1994, Manson was assigned as the Little Rock, Arkansas, federal court news correspondent. As federal court news correspondent, Manson continued to report directly to Thompson and Chase. Although Bailey never directly supervised Manson, he was responsible for managing Manson's supervisors, Thompson and Chase. Bailey asserts that as the City Editor, he was responsible for "overseeing the editing process." *Id.,* at ¶ 3. He further asserts that:

> [a]ll news stories written by reporters are subjected to an editing process during which editors assess the value of proposed stories and review, revise, and determine whether to publish stories submitted by reporters and edit or modify stories prior to publication in the newspaper. No reporter at the ADG is given the authority or right to dictate to the editors which particular stories will appear, and in what form, in the newspaper.

*Id.*

Manson asserts that her primary duty was to report on the news from and concerning the federal courts in Arkansas, which included covering the federal prosecutions arising out of the "Whitewater" investigation into activities of President William Jefferson Clinton and First Lady Hillary Rodham Clinton. Manson states her duties required her to associate with federal judges in connection with the prep-

aration of newspaper articles which had political overtones and, at times, displeased certain governmental or political figures "whom the newspaper sought to please and contained facts which were true but contrary to the partisan political opinions of the Defendant." *Complaint,* at ¶ 7. Manson further alleges that her "articles were factually accurate in reporting certain federal judges' rulings and their statements related to the 'Whitewater' investigation which were viewed by officials of the paper, including the publisher, Walter E. Hussman, Jr., and the executive editor of the paper, Griffin Smith, Jr., to be favorable to the Clinton administration and not in support of editorial stances published by the newspaper." *Id.,* ¶ 8.

Manson asserts that from the instructions given to her by her editors concerning her coverage of Whitewater, and in particular her coverage of the trials of Jim Guy Tucker and Jim and Susan McDougal, she believed that she was being told to "give the wrong impression" about issues concerning Whitewater. *Patricia Manson's Deposition,* at 115. Manson admitted, however, that she was never "directly told to put false information" in a story concerning Whitewater. *Id.,* at 115–16.[2]

Manson was demoted and later terminated from her position as federal court news correspondent in December, 1996. Bailey stated that the decision to demote and terminate Manson was based on three incidents that occurred in 1996.

The first incident concerned an article written by Manson about a letter Judge William R. Wilson, Jr., had mailed to the appellate and district judges within the Eighth Circuit. The letter expressed Judge Wilson's concerns about the Eighth Circuit's decision to remove Judge Henry Woods from Jim Guy Tucker's case at the appellate level when no such request had been made at the trial court level. Defen-

---

**2.** Even though Manson made this statement at her deposition, in her statement of material facts in dispute, she asserts that she was asked to conceal information and that defen-

dant requested that she print a story that was not true. *Plaintiff's Statement of Material Facts in Dispute,* at ¶ 3.

dant requested the identity of the source who gave her the letter that Judge Wilson wrote, but Manson refused to reveal her source. Manson asserts that she did not reveal her source for the following reasons:

> I had promised that person I would not reveal the name, and I realized I had not been clear with that person. I had not made it clear that I might tell my editors if they asked, and I did not want to take advantage of a misunderstanding that I had unintentionally created. Also that person was not the source of the story. Bill Wilson was the source of the story, once he acknowledged that he had written the letter.

*Patricia Manson's Deposition*, at 169. Manson asserts that she would not reveal the source based on the Supreme Court's interpretation of the Constitution.[3] Manson further asserts that the identity of her source was irrelevant because the source of the story was Judge Wilson and his letter, and not the individual who provided her with a copy of the letter.

As a result of her refusal to reveal her source, Manson was disciplined by Bailey. Bailey takes the position that Manson's refusal "was a breach of her obligation first and foremost as a reporter for the ADG, and a compromise of her journalistic integrity." *David Bailey's Affidavit*, at ¶ 5. Bailey placed a written reprimand in Manson's personnel file that stated in relevant part:

> Your recent failure to clearly set applicable terms for receipt of material from a confidential source and your resulting refusal to reveal the source to the executive director of the newspaper or to your supervising editor constitute a breach of duty that could justify termination of your employment.

*Defendant's Exhibit "4."*

Manson responded by writing a memorandum to Bailey stating that his reprimand was "unduly harsh and gives the wrong impression of [her] actions." *Defendant's Exhibit "5."* Manson stated that her failure to "clearly set out the terms under which [she] received material from a confidential source was an oversight" and was not "an intentional effort to conceal information from [her] editors." *Id.*

Manson also alleges that the refusal to identify a confidential source was a fairly routine practice at the *Arkansas Democrat-Gazette* at that time and that no one had been reprimanded for such behavior other than her. *See Plaintiff's Brief in Support of Response to Motion for Summary Judgment*, at 4. In support of this claim, Manson's offers the deposition testimony of Rodney Bowers who worked for defendant as a reporter during the same period of time. His testimony, however, does not seem to support this contention. Bowers testified at his deposition that Griffin Smith asked him to reveal his source for an article written on February 15, 1997, regarding the Whitewater investigation, and that he revealed his source on the condition that his source's name would never be revealed in court. *See Rodney Bower's Deposition*, at 15–16. Bowers stated that he understood defendant had a written confidential source policy that stated reporters could be asked by an editor who their source was and were required to divulge their source. *Id.*, at 24–25. Manson acknowledged that she believed that the "better practice" is to reveal her source to her editors if a question arises as to the credibility of those sources. *Defendant's Exhibit "5."*

The second incident concerned an interview that Manson had with Judge Wilson. Specifically, at some unspecified date in 1996, Manson was granted an interview by Judge Wilson. Manson recited the incidents that led up to her interview with Judge Wilson at her deposition:

> I had heard around the courthouse that Bill Wilson was willing to go on the

<hr>

**3.** Manson asserts that the Arkansas Shield Statute, Arkansas Code Annotated § 16–85–510 (Michie 1987), may also play a part in her refusal to reveal her source. *See Patricia Manson's Deposition*, at 170.

record about Whitewater. So I thought it probably wasn't true, but I thought I'd check it out. Glen Chase had told me several months before that if I ever talked to a judge on the record, I should tape the interview. And so I took my tape recorder, and I asked Bill Wilson if I could interview him about Whitewater, and he said, "Yes." And I said I wanted to tape the interview, and he said he wouldn't give the interview unless I let him have a copy of the tape after I was finished with it. I figured that I didn't have any problem with giving him the tape after I was finished with it, because he knew what he had said. It wasn't like I was turning over information that I shouldn't be giving to outsiders, and so I agreed to that.

And during the interview I kept trying to steer him to talk about Whitewater, but he kept going on and on about Paul Greenberg.[4] After the interview, I called Glen Chase and told him what had happened, and he said he'd check and see if the paper wanted a story. He called me back later that day, said he discussed it with—I forget who he said he discussed it with, but they decided they didn't want a story. That this was something more appropriate for the editorial page, and I think he said someone had suggested that Wilson write a letter to the editor.

*Patricia Manson's Deposition,* at 159–60.

A few days later, Manson gave Judge Wilson the original tape of the interview. *Id.,* at 160. After learning the defendant would not publish the interview, Judge Wilson, by letter, portions of which were quoted in the article, delivered a copy of what apparently was a transcript of the interview to another newspaper, the *Arkansas Times,* a competitor, which published it on November 22, 1996. *See Defendant's Exhibit "6."* Bailey asserts that Manson's decision to give the tape of her interview to Judge Wilson was "improper

and a breach of her duty to protect her work product for her employer." *David Bailey's Affidavit,* at ¶ 6.

The third incident occurred when on December 11, 1996, defendant published a story written by Manson in which Manson stated that the Eighth Circuit Court of Appeals had "ignored" prior precedent in reaching its decision to remove Judge Henry Woods as the presiding judge over Tucker's criminal trial. Griffin Smith, Jr., defendant's Executive Editor, disagreed with Manson's choice of words. As a result, a correction was printed that stated the Eighth Circuit panel "distinguished, rather than ignored, other 8th Circuit rulings in similar cases." *Defendant's Exhibit "8."* The correction stated that the previous story had "misstated the panel's decision." *Id.* Manson sent a memorandum to Griffin Smith, Jr., stating that she believed the correction "incorrectly asserts that [she] misstated the panel's decision." *Defendant's Exhibit "9."*

Bailey asserts that after these three incidents, he and Griffin Smith, Jr., discussed what action should be taken against Manson. Bailey asserts that they agreed that Manson should be removed from covering the federal courthouse. On December 17, 1996, Bailey removed Manson from the federal courthouse beat, and returned her to the position as a general assignment reporter working under Chase. Manson wrote a memorandum to Griffin Smith regarding her demotion that stated in part:

I believe this action was taken because my attempts to place Whitewater in perspective and what in my opinion was accurate reporting offended your conservative political views, as well as those of the Democrat–Gazette's publisher, other newspaper employees and some members of the Arkansas legal community. I believe my attempts to place Whitewater in perspective and what in

---

4. Paul Greenberg is the editor of the editorial page and an editorial writer for defendant newspaper. According to the *Arkansas Times* article, Judge Wilson "is frequently and sharply criticized in the writings of Paul Greenberg, editor of the editorial page of the *Arkansas Democrat–Gazette,* the state's largest newspaper." *Defendant's Exhibit "6."*

my opinion was accurate reporting also embarrassed certain members of the 8th Circuit.

She then goes on to question the honesty and integrity of her employer's executive editor by saying:

> Because I feel that on more than one occasion you have told me one thing and then instructed my supervisors to take actions contrary to your words, please respond to this memorandum in writing. Also, please put in writing any other communications concerning my job status.

*Defendant's Exhibit "14."*

Her employer obliged six days later by advising her, in writing, that her "services as a reporter at the Democrat–Gazette are no longer needed." *Defendant's Exhibit "15."* The termination letter was dated December 26, 1996.

Manson stated at her deposition that she also believes that, although her Whitewater coverage was the "immediate trigger" for her removal, her age and sex were also factors. *Patricia Manson's Deposition*, at 176. Specifically, Manson stated that her age and sex:

> played a part in the paper's, David Bailey's and other editors', their dislike for me, their treatment of me, combined with the—their dislike of my—their—the fact that they didn't like my Whitewater reporting, because I didn't slant my reporting to coincide with the paper's editorial view. I think those were all involved in the paper's editorial treatment of me. The reasons cited for my removal from the federal courthouse all involved Whitewater, and that's what I was focusing on in this memo.

*Id.*, at 178. Manson stated that on December 20, 1996, the date she wrote the above memorandum, she believed that she was being discriminated against on the basis of age and sex, in addition to the fact that she believed the action was taken because of her Whitewater coverage. *Id.*, at 181.

Defendant had a policy regarding discrimination which stated that the company did not permit illegal discrimination and that if any employee felt that he or she was a victim of harassment or discrimination, he or she should "promptly report the complaint to the department head or the personnel director within 24 hours of the incident." *Exhibit "3" to Patricia Manson's Deposition.* Manson stated at her deposition that she does not recall ever seeing defendant's policy, but that she did not go to any editors or any management to complain about discrimination based on sex or age because she thought it would be useless. *Patricia Manson's Deposition*, at 165.

Manson filed a charge of discrimination on March 13, 1997, stating that she believed that she was reprimanded, demoted and terminated because:

> (a) I am over forty (40) and female. (b) The newspaper perceived that certain federal judges respected my reporting ability. (c) The newspaper believed my reporting undercut its editorial stance. The newspaper also sought to please certain government and/or political figures the newspaper believed were displeased or offended by my reporting.

*Defendant's Exhibit "16."*

### Summary Judgment Standard.

"Summary judgment is only appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Callanan v. Runyun*, 75 F.3d 1293, 1296 (8th Cir. 1996) (citations omitted). All disputed facts are resolved and all inferences drawn in favor of the nonmoving party. *Id.*

The Eighth Circuit has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir.1979). This is especially true in discrimination cases because they often turn on inferences rather than direct evidence. Thus, the court has stated: "we are particularly deferential to the non-moving party

alleging discrimination." *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996).

The court has made it clear, however, that the non-moving party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *National Bank of Commerce v. Dow Chemical Co.,* 165 F.3d 602, 607 (8th Cir. 1999) (*quoting Malsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Rather, the non-moving party "must show there is sufficient evidence to support a jury verdict in [her] favor." *Id.* (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

*Discussion.*

1. Employment Discrimination.

The ADEA provides that "[i]t shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623 (1985). The ADEA applies to "individuals who are at least 40 years of age." 29 U.S.C. § 631 (Supp.1998). Likewise, Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1) (1994).

A plaintiff may establish age or sex discrimination by direct or indirect evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Fast v. Southern Union Co., Inc.,* 149 F.3d 885 (8th Cir.1998). The legal analysis under the ADEA parallels the analysis under Title VII, and, thus, the court will address both claims together. *See Hase v. Missouri Div. of Employment Sec.,* 972 F.2d 893, 896 (8th Cir.1992).

When relying on indirect evidence, a plaintiff uses the burden-shifting framework identified in *McDonnell Douglas v. Green. See, e.g., Price v. S–B Power Tool,* 75 F.3d 362, 364–65 (8th Cir.1996). To establish a prima facie case of discrimination in the termination context, the plaintiff must show: (1) she is age forty or over

and/or a member of a protected class; (2) that she met applicable job qualifications and satisfied the jobs normal requirements; (3) that despite these qualifications, she was demoted and/or discharged; and (4) she was replaced by a younger person and/or a man. *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir. 1998). Additionally, the plaintiff must demonstrate that the discharge occurred in "circumstances which allow the court to infer unlawful discrimination." *Davenport v. Riverview Gardens School Dist.,* 30 F.3d 940, 945 (8th Cir.1994) (internal quotation marks and citations omitted). *See also Williams v. Ford Motor Co.,* 14 F.3d 1305, 1308 (8th Cir.1994).

> [The] presentation of a prima facie case creates a legal presumption of unlawful discrimination. This presumption places an obligation upon the employer to produce evidence of a legitimate, nondiscriminatory reason for the plaintiff's discharge. If the employer carries this burden, the *legal* presumption of unlawful discrimination "drops out of the picture."

*Ryther v. KARE 11,* 108 F.3d 832, 836 (8th Cir.), *cert. denied,* 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997) (*quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–12, 113 S.Ct. 2742, 2747–50, 125 L.Ed.2d 407 (1993)).

The court went on to say:

> [i]n sum, when the employer produces a nondiscriminatory reason for its actions, the prima facie case no longer creates a legal presumption of unlawful discrimination. The *elements* of the prima facie case remain, however, and if they are accompanied by evidence of pretext and disbelief of the defendant's proffered explanation, they may permit the jury to find for the plaintiff. This is not to say that, for the plaintiff to succeed, simply proving pretext is necessarily enough. We emphasize that evidence of pretext will not by itself be enough to make a submissible case if it is, standing alone, inconsistent with a reasonable inference

of age discrimination. Furthermore, as the *Hicks* Court explained, the plaintiff must still persuade the jury, from all the facts and circumstances, that the employment decision was based upon intentional discrimination.

*Ryther*, 108 F.3d at 837–38 (*citing Hicks*, 509 U.S. at 511 n. 4, 113 S.Ct. at 2750) (footnotes omitted).

■ As noted above, "[t]he employee at all times retains the burden of persuading the trier of fact that he has been the victim of illegal discrimination due to his [age]." *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir.1995). Or in other words, the employee has the ultimate burden of proving that her age or her sex *actually motivated* the employer in taking the adverse employment action. *See Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir.1996).

A plaintiff may also prove her case by presenting direct evidence of discrimination, but Manson has not presented any direct evidence of age or gender discrimination. Thus, the court turns to an analysis of Manson's case under the *McDonnell Douglas* burden shifting framework.

In *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the Supreme Court said:

A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for [firing an employee within a protected class] have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts

only with *some* reason, based his decision on an impermissible consideration.

(citation omitted).

■ "One common way to raise an inference is to prove disparate treatment by showing that [plaintiff] was treated less favorably than similarly situated employees who are not in plaintiff's protected class." *Wallin v. Minnesota Dep't of Corrections*, 153 F.3d 681, 687 (8th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999) (internal quotation marks and citation omitted). "Employees are similarly situated when they are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* (internal quotation marks and citation omitted).

■ Defendant asserts Manson cannot establish a prima facie case of intentional discrimination on the basis of her age or sex. Defendant further asserts that even if the court finds that Manson has made a prima facie showing, it has come forward with legitimate non-discriminatory reasons for discharging Manson, namely, her pattern of poor judgment and insubordination in the months prior to her termination. Furthermore, defendant asserts that Manson cannot establish that its reason for terminating her was merely pretext for illegal discrimination.

Manson asserts that she can establish a prima facie case of discrimination because: (1) she is a member of a protected class, *i.e.*, she is over forty years old and she is female; (2) she was qualified for the position she held as a federal court news correspondent; and (3) she was demoted and later terminated. Manson asserts that the court can infer unlawful discrimination because was replaced by a younger male employee.[5]

The court does not believe that plaintiff has met the *McDonnell Douglas* test be-

---

5. Despite Manson's statement that "there is no dispute that [she] was replaced by a younger male employee," there is nothing in the record that substantiates her assertion. *Plaintiff's Brief in Support of Response to Motion for Summary Judgment*, at 4.

cause it is clear that Manson had not met her employer's legitimate expectations and, thus, did not satisfy the job's normal requirements, and, as already indicated, she has failed to show that she was replaced by a male or someone younger than her rather young 40 years of age. However, even if the court accepted, for purposes of this summary judgment motion, that Manson had proffered enough evidence to establish a prima facie case of discrimination, there is no question that defendant has put forth legitimate non-discriminatory reasons for her termination. Thus, Manson can only survive summary judgment by proving pretext, *i.e.*, by proving that she was treated less favorably than similarly situated employees who are not in her protected classes, or, in some other manner, has shown that the employer's proffered reasons for its actions are not worthy of belief.

Manson asserts that the reasons defendant puts forward for her termination are clearly pretextual. First, with respect to her refusal to identify her source, Manson asserts that the refusal to identify a confidential source was a routine practice at the *Arkansas Democrat–Gazette*, and that no employment policy to the contrary existed at the time. Second, with respect to her conduct in giving Judge Wilson the original of his tape-recorded interview, Manson asserts that there was no policy that prohibited or admonished such behavior. Finally, with respect to the "correction" published by defendant, Manson asserts that she refused to submit to a statement that acknowledged her earlier story was incorrect, and that there was no policy that existed which prohibited her actions.

Manson has simply not met her burden on the issue of pretext. She has not come forward with any evidence, other than her own assertions, that other *Arkansas Democrat–Gazette* reporters, who are younger and male, were treated more favorably than she was treated under similar circumstances. In fact, Bowers testified that defendant had a policy of requiring its reporters to reveal his or her source to an editor if asked to do so. In addition, Man-

son admitted that the better practice is to reveal her source to her editor. Similarly, there is no evidence that the other incidents cited by defendant as grounds for Manson's termination were pretextual. In other words, the court finds that all of the reasons given by defendant for Manson's termination are legitimate, and that no reasonable person could believe that defendant based its decision on any impermissible considerations such as Manson's age or sex.

### 2. Wrongful Discharge.

■ Defendant contends plaintiff was an at-will-employee who could be discharged for good cause, no cause, and even a morally wrong cause. Second, defendant contends public policy does not require a newspaper to publish whatever a reporter desires. In fact, it argues the First Amendment to the United States Constitution protects its exercise of editorial freedom.

While Arkansas has long adhered to the employment-at-will doctrine, it has in recent years announced modifications to the doctrine. *See e.g., Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380 (1988); *Gladden v. Arkansas Children's Hosp.,* 292 Ark. 130, 728 S.W.2d 501 (1987). *See also Scholtes v. Signal Delivery Service, Inc.,* 548 F.Supp. 487 (W.D.Ark.1982). It has recognized exceptions when: (1) there is an employment agreement containing a provision for a definite term, in which case firing may be only for cause; (2) there is an express provision against termination except for cause contained in an employee handbook or manual and such provision is relied on by the employee; (3) where an employee is fired in violation of a well-established public policy of the State of Arkansas; and (4) cases in which the employee is discharged for exercising statutory rights or refusing to violate a criminal statute. Manson asserts that she falls within the third exception to the at-will doctrine, *i.e.*, that she was terminated because she refused to

falsify and conceal information which is in violation of the public policy of the State of Arkansas.

In *Sterling Drug* the court held that "an at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state." *Sterling Drug*, 294 Ark. at 249, 743 S.W.2d at 385. The court noted that "[t]his is a limited exception to the employment-at-will doctrine. It is not meant to protect merely private or proprietary interests." *Id.*

■ The Arkansas Supreme Court has stated that the public policy of the state is found in its constitution and statutes. *See Wal–Mart Stores, Inc. v. Baysinger*, 306 Ark. 239, 812 S.W.2d 463 (1991). The court has further indicated that public policy can be contravened "when the reason alleged to be the basis for a discharge is so repugnant to the general good as to deserve the label 'against public policy.'" *Smith v. American Greetings Corp.*, 304 Ark. 596, 598, 804 S.W.2d 683, 684 (1991) (citation omitted). The exceptions are recognized only "to protect a well-established and substantial public policy ...." *City of Green Forest v. Morse*, 316 Ark. 540, 547, 873 S.W.2d 155, 158 (1994). "The existence of a clear and substantial public policy presents a question of law." *Id.*

While the Arkansas courts have not specifically addressed the issue of whether an allegation that someone was discharged for exercising her free speech rights states a cause of action for wrongful discharge, this court in the case of *Parsons v. Burns*, 846 F.Supp. 1372, 1381 (W.D.Ark.1993) ruled that "a termination in violation of an individual's constitutional rights can form the basis of both a federal claim and a state wrongful discharge claim." The *Parsons* case involved a claim by a nontenured community college teacher that he was discharged in violation of his First Amendment rights. *See also Ark. Const.* art. 2, § 6.

■ As the court stated in its previous opinion, "[t]he right of freedom of speech does not open every avenue to one who desires to use a particular outlet for expression." *Avins v. Rutgers State University of N.J.*, 385 F.2d 151, 152 (3d Cir. 1967) "Nor does freedom of speech comprehend the right to speak on any subject at any time." *Id.* at 153. "Thus, one who claims that [her] constitutional right to freedom of speech has been abridged must show that [she] has a right to use the particular medium through which [she] seeks to speak." *Id.*

■ A reporter has no free-standing First Amendment right to have her articles published by a privately-owned newspaper for which she works. *Cf., Denver Area Educ. Telecom. Consortium v. F.C.C.*, 518 U.S. 727, 116 S.Ct. 2374, 2421, 135 L.Ed.2d 888 (1996) (Thomas, J., concurring in part and dissenting in part); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256–58, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The rights of members of the news media are "coextensive with and do not exceed those of members of the public in general." *In re Greensboro News Co.*, 727 F.2d 1320, 1322 (4th Cir.1984).

■ As defendant correctly points out, the state cannot restrict the free expression rights of a newspaper's owners or publishers. The Supreme Court stated in *Miami Herald Publishing Company v. Tornillo*, stated:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials ... whether fair or unfair ... constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Miami Herald*, 418 U.S. at 258, 94 S.Ct. 2831. In short, defendant has the right to control the content of the paper. *Cf. Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir.1986)(Courts must be slow to in-

trude into area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. Under the First Amendment, choice of what to select must almost always be left to writers and editors).

■ Article 2, Section 6 of the Arkansas Constitution provides that "[t]he liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, being responsible for the abuse of such right." Ark. Const. art. 2, § 6. To force a privately owned newspaper to publish articles written by its reporters against their editorial judgment would be to advance the First Amendment rights of the reporter over the free press rights granted to the newspaper. A reporter is employed to cover the news and write articles. It is the reporter's job performance and innumerable other factors that enter into the editor's decisions.

> Editorial integrity and credibility are core objectives of editorial control and thus merit protection under the free press clauses. This conclusion is illustrated by a well-worded opinion by Chief Justice Burger: "The power of a privately owned newspaper to advance its own political, social, and economic views is bounded only by two factors: first, the acceptance of a sufficient number of readers—and hence advertisers—to assure financial success; and second, the journalistic integrity of its editors and publishers."

Nelson v. McClatchy Newspapers, Inc., 131 Wash.2d 523, 936 P.2d 1123, 1131 (1997), cert. denied, —— U.S. ——, 118 S.Ct. 175, 139 L.Ed.2d 117 (1997) (quoting Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 117, 93 S.Ct. 2080, 2094, 36 L.Ed.2d 772 (1973) (Burger, C.J., plurality op.)). In fact, it has been said that editorial integrity is to a newspaper what machinery is to a manufacturer. Newspaper Guild of Greater Philadelphia, Local 10 v. N.L.R.B., 636 F.2d 550, 560 (D.C.Cir.1980).

Manson asserts that through defendant's instructions, she was given the impression that she was to "slant [her] reporting and to give misimpression about what was really going on." Patricia Manson's Deposition, at 117. Manson further asserts that when she refused to draft a "false correction," she was demoted and the correction was run in her absence. Plaintiff's Brief in Support in Response to Motion for Summary Judgment, at 7. Thus, Manson asserts she was terminated "based on her refusal to conceal and falsify information in violation of her First Amendment Rights and the public policy of Arkansas." Id. As stated earlier, however, Manson conceded in her deposition that she was never directly told to put false information in a story. Id., at 115. In addition, she stated that "[t]here weren't any falsehoods inserted into any of [her] stories that [she] [could] remember." Id., at 117. Apparently, Manson believes that the decision by her editors to change the word "ignored" to "distinguished" constituted a falsification of the Eighth Circuit's decision. Manson further contends that the defendant's request that she "slant" her stories in favor of a prosecutor, i.e., Kenneth Starr, violated public policy because such false stories "could arguably affect a appellate court's decision." Plaintiff's Brief in Support of Motion for Summary Judgment, at 7.

The court concludes that Manson has failed to create a genuine issue of material fact with respect to the issue of whether she was discharged in violation of Arkansas public policy. The Arkansas Democrat-Gazette has the right to advance its own political, social, and economic views, and there is no evidence that its editors attempted to get Manson to falsify or conceal information in her stories.

Conclusion.

For the reasons stated, defendant's motion for summary judgment will be granted. Plaintiff simply has no case, at least

not a federal one, and no reasonable person could believe that she does.

The court mentioned earlier that the courts have developed two tests to aid in determining when employment discrimination has occurred—the direct evidence and indirect evidence approaches. Plaintiff does not contend that she has presented sufficient direct evidence to meet her burden, and, as indicated, she has fallen woefully short of meeting the indirect evidence test. All she has shown is that she was, at the time of the employer actions complained of, a woman barely 40 years old.[6]

In short, plaintiff says, and all she has shown is, that: "I'm a woman. I'm 40 years old. The employer didn't treat me right. They must have done it because I am a 40 year old woman." That simply does not follow, and no reasonable person could believe that it does. Besides, it just isn't the law.

The evidence in respect to Ms. Manson's actions and conduct is not in substantial dispute. Based on that conduct and those actions, the fact is that the record shows that the employer had ample and abundant reasons to believe that Ms. Manson was insubordinate, that she failed and, in fact, refused to follow obviously legitimate rules of her employer, that she attempted to tell her employer how to run its newspaper and what to publish, and that she gave away its property (property that it had paid her to produce), resulting in its use by a competitor in an article that was very critical (to say the least) of its editorial page editor. That will get you "fired" almost anywhere.

A separate order shall be entered concurrently herewith.

---

**6.** The court recognizes that Congress had to draw the line somewhere, and chose 40 as the lower limit of the law. However, the court does not believe that, in this day and time, there is really anyone left out there who truly believes that a 40 year old person is "too old" to do anything, at least in a profession such as Ms. Manson's.